May it please the Court, good morning. My name is Ed Sankster. I'm here on behalf of Appellant Quicken Loans, Inc. The first matter I'd like to address is the applicability of the case dealing with what we call Didmica, which is Wells Fargo v. Boutros. I don't believe that case controls here for two reasons. One, the factual predicate of that case is contradicted by the record before the Court. The key finding on which the Court concluded that Didmica would not preempt the per diem statute was found at page 969 of the Wells Fargo decision, 419F3, 969. That point, and I'm just going to cite the one particular portion, but it said, banks were free to alter the post-recordation rate of interest to account for any pre-recordation no interest period, thereby collecting the same total amount of interest as they would have collected had they charged pre-interest recordation or, excuse me, interest pre-recordation. The record before this Court contradicts that assumption. I would point the Court to Mr. McGinnis' declaration, which is at the excerpts of record, page 59, paragraph 7, quote, because Quicken Loans has no way to predict the delay, Quicken Loans is unable to compensate for issues under the per diem restriction by charging higher rates of interest on loans that correspond to the lost interest. I would also point the Court to the Commissioner's response to Quicken Loans' statement of undisputed facts. In response to Quicken Loans' assertion that it could not compensate for lost pre-recordation interest, the Commissioner merely stated that it lacked sufficient information to admit or deny and, therefore, was denying on that basis. But the Commissioner submitted no evidence to contradict the evidence that was before the Court. So the key underpinning of that decision, if this wasn't before the Court in Wells Fargo v. Boutros, but it is here, and the record here shows that there is no ability for the lender to make up for lost pre-recordation interest. The other thing that wasn't before the Court in Wells Fargo v. Boutros is the Parity Act. In other words, the Court assumed there that the lender had a means of making up for the lost interest. But the Parity Act wasn't before it. And here, one of the key arguments that Quicken Loans is making is that, in fact, it's precluded from adjusting the amounts of interest or the payments or the rates by 12 CFR 560.35. So, in other words, it's effectively bookended here. Quicken Loans has no ability to anticipate and, therefore, make up for the lost interest, and then at the back end it has no ability to adjust the amounts of payments or the interest rates in order to collect it some other way. And that was a key part of the Court's rationale in Wells Fargo v. Boutros. We've also indicated that we think the finding on DIDMCA was Sotomayor, why is it that it can't estimate on an overall basis how much it loses by not being able to charge and adjust its basic rate to cover that? Because it has to adjust it on a case-by-case basis, Your Honor. Why does it have to adjust it on a case-by-case basis? Because it's a contract with a particular borrower, and it's required to make disclosures as to the precise amount of interest that will be paid for. But what I'm saying is, if you take into account when you set your interest rate, that you're not going to be able to charge for interest for the pre-loan period, why can't you say, over the years we lose, or over a year we lose $2 million, that we can't get an interest for this period? Therefore, we're going to adjust our interest rate in general so that we'll recoup that $2 million.  Because then you're depriving the state-chartered lenders of the parity that the Parity Act assures it. You're saying they have to charge a higher interest rate than the federally-chartered lenders. So I think your question illustrates our very point. But beside that, they would have to essentially anticipate what the amount of the recording delays would be. The evidence before the district court is, we have no way of doing that. That was the evidence that was presented. And again, it was uncontradicted. But I've done, I think I've answered your Honor's question. But in effect, the only way, if you were trying to do some allocation, is you have to set a higher interest rate. And that's the very evil that Congress was trying to avoid, or one of the evils that they were trying to avoid with the Parity Act, was to make sure that state-chartered housing lenders are on equal footing with federally-chartered housing lenders. The other point that I want to make about the Wells Fargo case is I believe that the decision on BIDMCA was unnecessary to holding. The court there said it was necessary to the holding because it was necessary to define the scope of the injunctive relief before the court. But the first ruling that the court made there was that the commissioner had no right to prosecute, to enforce the regulations. Therefore, the injunction was you can't enforce any regulations or laws against this lender. Going on and ruling on the subsidiary point, which is, aside from the fact that you can't enforce any regulations or laws, you also can't enforce this specific law, I think was unnecessary. And that merely goes to the fact that if the court accepts my argument, is it already bound? Is it already bound by the earlier panel's decision? Our position is it's dicta. And, again, there's a key fact setting it apart. Finally, I want to mention that in Wells Fargo, the court took on the phrase expressly limiting interest. And I think that was also a key issue in the court's reasoning, which is finding that the per diem statute did not expressly limit interest. And I would ask the court or invite the court to closely read that analysis, because it only focuses on express limits of the rate of interest and, again, has the analytical, I think, flaw that the total amount of interest can be made up on the back end of a loan. Next, I'd like to address the ripeness issue on the takings claim. I want to clarify that Quicken Loans is not asserting that this Court should address this on the merits, because it was never addressed on the merits by the district court. The Commissioner's position goes on at length about why it's an unmeritorious claim, but the only issue that was decided, but the merits of it weren't addressed. The only issue was whether it's ripe. Here, I think the district court's error arose from its focus on the wrong decision. The district court examined the decision as to whether the Quicken Loans license would be revoked and questioned counsel sua sponte whether or not the decision to revoke the license was final. Well, the decision that's at issue here is the decision that orders Quicken Loans to refund the money. That decision was final. The Commissioner admitted that it was final, concedes it's final. The final decision can be found at the excerpts of record, page 68, where the Commissioner orders Quicken Loans to refund the interest. The other issue that the district court erred on was assuming that Quicken Loans had to prove the exact amount of the money that would be taken, which, because this is a case challenging that it's not a taking for a public purpose, the case law of this Court is we don't have to prove the exact amount of the interest. And the Washington Legal Foundation, I think it was Washington Legal Foundation case, made it clear that the exact amount of interest does not need to be shown in order for the case to be ripe, nor do you have to exhaust the State law procedures for obtaining compensation when you're essentially challenging the legitimacy of any taking. The question here is not compensation at the threshold. It's whether or not a taking can be done at all. With that, Your Honor, I would like to reserve my remaining time unless the Court has any questions. May it please the Court. My name is Douglas Gooding, counsel for the Commissioner in this case. I would like to address, first of all, the comments made by the appellant regarding DIDMCA. The Court in Wells Fargo did address the issue of the alleged problem about adjusting the loan for the loss of interest and so forth. And it said that it is not the impact, the likely impact of a law that it was addressing in its preemption decision, but rather simply using statutory interpretation tools, whether this statute expressly limited the rate or amount of interest, and it ruled that it didn't. Whatever impact it had on some days of interest on the front end of the loan or what adjustments were or did not have to be made are irrelevant to its analysis of the preemption issue. The issue is whether it expressly preempted or expressly limited the rate or amount of interest, and it held correctly, we believe, that it did not. The issue of whether or not it needed to reach the DIDMCA issue, and therefore whether or not it's a dictum, I think is easily resolvable by realizing that there's a companion statute, Civil Code 2948.5, that was not within the ambit of the Wells Fargo Court's Bank Act decision. The Bank Act portion of the decision simply said that the Commissioner did not have the right to directly address the Civil Code section, which is a companion per diem statute to 50204. So therefore, the Wells Fargo decision did need to and did reach the issue of DIDMCA preemption. The takings claim, we stated in our brief that we did not oppose the ripeness  And we think, as a matter of fairness, we do not directly do it here. But I would like to point out to the Court that the extent to which the Commissioner has taken action in this case are indeed letters that are in the record making certain demands under the statute, but also has filed an accusation as opposed to any final order under 50321 or 50323 of the Financial Code. That accusation provides under the Financial Code for notice and opportunity to be heard and to hearing, all of which have not yet taken place. And, in fact, there has been no decision rendered under the Administrative Procedure Act by the Office of Administrative Hearings. There has been no decision of the Commissioner either confirming or denying any such order since it has not been made. And even if that had taken place, the APA provides for remedies from the remedies to the license holder by writ of mandamus and a stay of proceedings during that time. So there the Court below, looking at the status of this case, may have rightly ruled that the case was not ripe because there is no finality. There's also one other issue, pardon me, about the takings claim. I do not wish to lapse into an argument on the merits because that is not before you, but there's one aspect of the case that sort of overlaps into the ripeness issue, which is that there's a vicious circle here not of a Commissioner's creation, which is one of the elements of the takings case is the substantialness, if you will, of the amounts in question relative to the larger picture, the small amount relative to the interest for life alone, et cetera. And we can't do that. We can't make that factual determination because Quicken won't do the audit. And that's their decision. So the fact that the case may not be ripe as to that issue or cannot be determined on the merits is actually the fault, if you will, of Quicken, not of a Commissioner. The Parity Act is a statutory scheme which was developed or enacted in the context of a perceived need by Congress to expand the extent of alternative mortgages available in the mortgage market. To that extent, Congress wished to provide for State lenders to be able to enjoy some degree of parity with federally chartered lenders. However, the Parity Act itself provides in 3803 that you are not a housing creditor subject to the Parity Act unless you are licensed by a State, if you need to be licensed by a State. And Quicken has stipulated in the facts of this case that it is a State chartered lender that needs a California license to operate. Therefore, clearly, the whole extent or whole question of the extent of preemption to which Quicken is entitled is seen from the perspective of it being a State chartered lender admittedly subject to State laws, and the issue is what extent of preemption is necessary to affect the intent of the Parity Act. When Congress first enacted the Act, it directed the Office of Thrift Supervision, OTS, to decide which aspects of its numerous banking regulations was important to alternative mortgage transaction lenders, and it cited four. Today, as we sit here today, there are only two. And they are adjustments or regs regarding adjustments and regulations regarding disclosures. The point of the Parity Act and the extent of preemption that is available to Quicken in this case is if it complies with the Federal regulation regarding adjustments, it is entitled to preemption from State regulations that govern adjustments. If it complies with the Federal regulation regarding disclosures, it is entitled to preemption from State laws that purport to regulate disclosures. That's what it needs to have parity with Federal lenders, and that's what it gets. If it is claiming it is entitled to more than that, we would be left with the anomaly that a State lender like Quicken is not generally regulated by Federal agencies, because it is not a Federal lender, and is claiming that it would have preemption over laws of State agencies over subjects that OTS did not consider applicable to a State lender. So in short, it would not be regulated. And that cannot be the intent of Congress. I would like, if I may, to reserve the balance of my argument to respond to a ---- We do have cross appeals in this case, I guess. You have a cross appeal, right? Yes. Do you want to talk about your cross appeal now? The cross appeal, Your Honor, was on DIDMCA, and I did address the extent to which we believe it is applicable. All right. Thank you. That is the only aspect of our cross appeal, or the only issue raised by it. Thank you. Thank you. Thank you. I think I heard the Commissioner's counsel kind of try to undermine the notion that it really made a final decision. So I would point the Court to the transcript of the proceedings below, in which the matter was left with no ambiguity. Page 540 of the excerpts of record, which is the transcript where the Court asked Mr. Gooding whether or not there had been a final decision, and his response was, I think this is one issue upon which we actually agree with the plaintiffs insofar as that the Commissioner has made a decision, communicated that to the plaintiffs with regard to how he intends to interpret the statute and what action is requested and required or required of Quicken Loans. Now, is this the taking? This is the taking, Your Honor. What is final about that? If he says this is what we plan to do, he hasn't done anything yet. He has said something. He said you're required to do it. So just as the statute was final in the ordinance in San Francisco was final in the San Remo case, the taking was effective, the decision was final upon that enactment of the decision. So they didn't have to go through the whole proceedings. It's merely final once the rule is enacted. The same with the Washington Legal Foundation case. Once the statute that requires the action is enacted, that's final. Here what was different is the statutes on their face don't require what the Commissioner asserted. And it was then the Commissioner who said closing of the transaction means the date the recorder stamps the document and says it's recorded. And it was when they said that's what you must do, that's what you must comply with, or else your license will be revoked. That's when the decision became final. And, in fact, the revocation decision that's before the court or the accusation that's in the record makes it clear that the license is in the process of being revoked because of the noncompliance with that final decision. So to come here now and say, well, the decision really wasn't final, is the opposite of what the Commissioner. Are you saying there are license revocation proceedings going on now? Yes, Your Honor. No. Quicken Loans license is being revoked, is in the process of being revoked, because of its challenge in this case. And I don't know if this is in the record or not, but just by way of information, it's been by agreement of the Commissioner and Quicken Loans stayed or put on hold pending the outcome here, since the outcome here, obviously, will determine what Quicken Loans' rights are in terms of the Parity Act and the takings claim. But under San Remo and under Washington Legal Foundation, we don't have to have our license revoked in order to have a final decision. When that's in effect, what the Commissioner is saying is you have to go, in order to challenge this and have a final decision, you have to let your license get revoked, or else you have to comply with what we believe is an unconstitutional taking for a private purpose. And Quicken Loans is entitled to have an adjudication of whether the taking is appropriate in the first instance, whether there is a public purpose, before it's required to comply or have its license revoked. So the problem with the ‑‑ I'd like to respond briefly to counsel's arguments regarding the adjustments. The problem is that the adjustments contemplated in Wells Fargo would not comply with 12 CFR 560.35. It just wouldn't comply with it. There's no way to do it. The Commissioner has never been able to articulate how that could be done. And, in fact, it can't. It's simply a matter of mathematics. Counsel said that there are only two regulations that are applicable at this point under the OTS regulations. Well, one of those two regulations is the one that we're here arguing under, which is 560.35. So the fact that it's been narrowed down to two regulations is really of not great importance. But even so, the recent rulemaking in 2002, several parties requested the OTS to limit the scope of preemption just to those two specific regulations. And the OTS didn't do that. In fact, it cited in its regulatory final rule an earlier opinion in which it made clear that preemption is not limited to the two particular or the identified regulations. So I think there's a reasonable inference that the OTS did not intend to have it so limited. Finally, I'd like to point out that what we're talking here is not about taking or charging borrowers interest on money they don't have. What we're talking about here is a situation in which Quicken Loans is being compelled to make an interest-free loan to borrowers, to give it money and not charge it interest through no fault of Quicken Loans' own and because of things that are totally outside Quicken Loans' control. We have here a legislative finding in which the state legislature acknowledged that the recorder's offices were backed up by weeks at a time, meaning everybody does everything to close this loan, the borrower gets his money, the borrower goes out and can do whatever he wants with it, and the recorder's office is weeks behind. That's nothing that Quicken Loans has any control over. And because of that, we're in kind of the crazy situation of saying, well, because the recorder's office is behind, we're going to make Quicken Loans make an interest-free loan. And that's, I mean, there's no equity to that, and that's not what, whether I could say it's unfair, it is unfair, but more importantly, the California legislature stated when it amended the statute, this is not what we intended. This is not what we intended to have happen. We thought that the money wouldn't be dispersed until the loan was recorded. That's just not what happened. So thank you, Your Honor. Thank you, counsel. Let me address first the takings issue. Counsel stated that the license is in the process of being revoked, and that is not really an entirely ---- But it's stated. It's not entirely fair or accurate to begin with. We did not choose to pursue the option of simply issuing an order, a final order, an order that would become final that certain violations had occurred. We chose the option of filing an accusation for two reasons. One, because we believe that violations had occurred. But secondly, the Commissioner was of the opinion that had the Department known when Quicken applied for the license, that it believed itself preempted from some of our laws that a license would not have been issued in the first place, and that is the thing. Was there a burden to lay that out? No, no. I don't think that's the issue before you. I don't think we have to reach that, Your Honor. But 50327 permits the Commissioner to seek to revoke a license, among other reasons, on the basis of any facts that had been known at the time of application would have warranted a denial of the license. So that's why 50327 has been used, and that's why there's an accusation pending. It's different than the Commissioner saying that an entity in Quicken's position when applying for a California license must tell the Commissioner, oh, by the way, we think this particular California statute is preempted by Federal law. I believe, Your Honor, that is the issue that we have raised to be determined by the Office of Administrative Hearings and then confirmed or denied by the Commissioner under the APA, yes. I believe that if an entity applies for a license but is of the opinion and of the intent to refuse to comply with certain provisions under it, that is a basis for denial of the license in the first place. And the Financial Code ---- The evidence is there that they would refuse to comply. They have done so. They refused to undergo the audit that would allow us to determine ---- They sought a judicial determination that they didn't have to. I'm sorry, sir. I thought they were seeking in this ---- these proceedings globally a judicial slash administrative determination that they didn't have to. And that's why we have agreed to stay and several times postpone the final hearing of that accusation. Because we understand that that's a conundrum. That's a rock-and-hard place. And the logical ---- You have a question on another subject. Is it correct, as counsel says, that the money is dispersed and for several weeks then it's used by the borrower and the under your regulation that they may not charge interest for that period simply because it's not recorded? It is not our regulation in this particular case, Your Honor. It's the two statutes that were in effect at the time, the Financial Code statute and the Civil Code statute. Do the borrowers receive the money? I'm sorry? Do the borrowers receive and have the use of the money but don't have to pay interest until it's actually recorded? The Act provides ---- both statutes provide that the lender may charge one day of interest prior to either close of escrow or recordation, depending on the time in question. Regardless of whether the borrower receives the money and can spend it, do whatever he wants with it. That is how they have read since their enactment, yes. But that is ---- but this Circuit has already ruled that that provision does not expressly limit the rate or amount of interest and, therefore, is not in violation or is not preempted by DIDMCA. And the fact that that is an ---- I mean, there are no ---- there's no basis for distinguishing this case from that case on this issue. Is that the only question about the validity of that provision, whether it's preempted or not? Yes. Well, Quicken also contends that the Parity Act also preempts it. So there are two claim bases for preemption. And the Wells Fargo ---- And the taking is a part of that, too? Yes. Well, they ---- Quicken can argue its own case, but they have contended that that constitutes a taking, that the merits of that, of course, that we concede are not before us. I would like to move on to ---- Have you ever seen somehow wrong to you that they can't charge interest when they've given the money to the consumer and the consumer has the use of the money? The ---- as we've argued in our brief, Your Honor, which, of course, we briefed before the Wells Fargo decision came down, the basis for these statutes, we believe, was to provide an incentive for the lender to assiduously and promptly complete all the steps necessary for it. I don't think there was anything before the Wells Fargo court that said that the consumers were receiving the funds and that they didn't have to pay interest after they received it. The question, I think, I think it was before the Wells Fargo court, was whether when the money was tied up and nobody had its use, you know, could they charge interest because they turned it over. I would beg to differ, Your Honor. I believe the Wells Fargo decision did contemplate the fact that there were alleged delays between the time of disbursement and recordation, or at least recordation as interpreted by the Commissioner. I would lastly like to make a point about the adjustments argument being made here. Quicken, I believe, seems to contend that the adjustments that it would like to make to recover its interest are in some way in violation of 560.35. There's no authority cited for the proposition that 560.35 applies to this kind of adjustment or this kind of situation. The statute itself or, pardon me, the regulation itself talks about adjustments to the interest rate because it contemplates, we argue and we believe, what's intended to apply to the adjustments to the interest rate that occur when the prime rate goes up or down or whatever index this particular loan is tied to.  They're trying to adjust the number of days for which they can claim interest. Correct. We simply think they're trying to take 560.35 and apply it to the situation for which it was not written or intended. Well, the statute, the assembly gave them one day on some kind of a legislative assumption, apparently, that it would take one day for the rest of it. From the assumption that recorders would be able to act in one day. Yes. I think recorders would get their job done in one day. In the real world, it may take anywhere from one to 14 or 15 or more, depending on the amount of traffic going through the office and how many people they have running the recording assembly line. Right. I think we have to be careful about apples and oranges here, though, because the adjustment argument they're making is, I believe, an effort to shoehorn themselves under the umbrella of the Federal regulation, the OTS regulation, 560.35, to claim preemption under the Parity Act. Whereas the issue of whether or not it is appropriate for the California legislature to have limited or to have set the computation of interest at one day prior to recordation is really a separate issue and an issue of preemption under DIDMCA, which we believe the Wells Fargo court addressed. This court did say in Wells Fargo that it did not preempt the interest rate. Correct. It didn't say anything about whether it preempted the number of days for which they could charge interest. I'm afraid I don't understand. That wasn't the question in Wells Fargo, wasn't, about the number of days for which interest could be charged, was it? Oh, very much so. The Wells Fargo in that case contended among them. I mean, there was a large Bank Act claim that said we were completely preempted from regulating them at all. But as the DIDMCA portion of the Wells Fargo decision. As we described in Wells Fargo what the problem was, it said that the statute says that the borrower shall not be required to pay interest. And then it says for a period in excess of one day prior to recording of the mortgage or deed, if the loan proceeds are paid into escrow. Now, that meant if they were funds were in escrow, you didn't have to pay the interest while it was in escrow. It then says or if there is no escrow, the date on which the loan proceeds have been made available for withdrawal as a matter of right. So the idea of this statute, I think as it was presented to the court, was that money was put into escrow. And there the borrower didn't have any opportunity to use it and shouldn't be charged interest. And somebody had to unfairly pay, you know, either the lender or the borrower was going to get stuck with the cost of while it was in escrow. But I really don't think as we described the statute there, it wasn't that they couldn't charge interest when the borrower already had the money, simply because somebody hadn't recorded something. Your Honor, it's exactly the same statute in Wells Fargo as we have here. There's no difference. Yes, it is. But I'm saying as we described the statute in Wells Fargo, we were talking about a statute that said that while it's in escrow, they can't charge the borrower. And if there is no escrow, you can't charge the borrower until he can get the money. That's the way we described the statute. Maybe we misdescribed it. I don't believe so, Your Honor. The point is that the California legislature had to make or felt that there was a tension here between a need to resolve who bears the risk. Who bears the risk? Well, the money is not available to anybody. Well. That's why who bears the risk when the borrower has the money and is using it, simply because somebody hasn't filed something. And that the appropriate way to resolve that is to create an incentive for the lender to move the process forward, because it is within the ultimate control of the lender as to how fast this process goes. Who cares when it's recorded? I mean, what matters is whether these people have to pay interest when they don't have the money. Yes. But the legislature made What's the reason to make them not pay interest when they do have the money? The legislature made a decision at the time it initially enacted the statute, prior to amendment, that it would choose a bright line over which the lender had some element of control by trying to move the process forward as fast as possible. The Wells Fargo decision says that does not expressly limit the rate or amount of interest, which is really the only basis for preemption under DIDMCA, is whether it expresses interest. That's true. As far as preemption, that's what the Court said. Yes. But what I was also saying, this is related to the question of the what the statute provides. Yes, Your Honor. But there is no So the Court understood what the statute did. It was that they understood that the question was who pays interest during the period the money was in escrow. I think that may be a point of debate or dispute about some element of fairness in real estate transactions, but the only basis for relief claimed by either Wells Fargo or Quicken is preemption under DIDMCA, which preempts only statutes that expressly limit the rate or amount of interest, and this one does not. But it does go to the takings argument, doesn't it? It may be, but that's not on the Court on its merits. It's not before the Court on its merits. Well, it's not on the merits because of the whiteness. Right. But if you – if we were to disagree with the whiteness ruling, then where are we? Then it goes back to district court. To be considered on the merits. Right. I believe I'm out of time, Your Honor. Thank you. All right. Well, thank you both very much. The argument was helpful, and we'll take the case into submission.
judges: Reinhardt, Noonan, Hawkins